IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MAURICE JAMES SJOBLOM,
on behalf of himself and a class of employees
and/or former employees similarly situated,

                    Plaintiff,

          v.                                              OPINION AND ORDER

CHARTER COMMUNICATIONS, LLC and                          07-cv-451-bbc
CHARTER COMMUNICATIONS, INC.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

        This is a civil action for monetary, declaratory and injunctive relief under the Fair

Labor Standards Act, 29 U.S.C. §§ 201-219, and Wisconsin law.  Plaintiff Maurice Sjoblom

alleges that defendants violated the Fair Labor Standards Act by not compensating him for

certain activities related to his assigned vehicle and equipment and failing to properly

calculate and pay sales commissions.  On October 5, 2007, dkt. #13, plaintiff moved for

conditional certification of an opt-in nationwide collective action under the statute on behalf

of himself and similarly situated current and former employees of defendants.  29 U.S.C. §

216(b).  In an order entered December 19, 2007, this court reserved a ruling on the motion

because the two affidavits submitted by plaintiff did not provide adequate support for the

conditional certification of a nationwide collective action.  Dkt. #154.  As directed, plaintiff

has filed further evidence in support of his motion and defendants have responded. Jurisdiction is present.  28 U.S.C. § 1331.

Also before the court are defendants' supplemental objections to certain declarations submitted in support of conditional certification and motion to strike portions of those declarations. Dkt. #230; see also February 14, 2008 Order, dkt. #227 (allowing defendants extra time within which to depose declarants and file objections).  Although the court had not asked plaintiff to submit a reply, he responded to defendants' concerns in a letter to the court dated February 27, 2008.  Dkt. #231.  Because defendants' objections and motion to strike raised new issues to which plaintiff had not had the opportunity to respond, I will consider plaintiff's reply.  Although I find most of defendants' objections to the declarations to be overstated, I agree that some paragraphs should be stricken.  This conclusion does not affect the outcome of the underlying motion for conditional certification.

Plaintiff has made a modest factual showing that he and potential class members were victims of a common policy or plan that violated the law.  Plaintiff's allegations are sufficient to suggest that he is similarly situated to other current or former Charter technicians who were assigned a company vehicle and took that vehicle home overnight.  Therefore, notifying potential class members of the existence of this lawsuit is appropriate.  I will authorize plaintiff's sending notice to the individuals that fall within the class.  The content and method of the notice will be the subject of a separate order.

Before I address the parties' arguments, I will summarize the relevant allegations contained in plaintiff's second amended complaint and the affidavits and depositions submitted in support of his supplemental brief.  The allegation of facts set forth in the court's December 19, 2007 order are incorporated by reference.

## ADDITIONAL ALLEGATIONS OF FACT

Plaintiff amended his complaint following the entry of the December 19, 2007 order to clarify that Charter Communications (CCI), Inc. (fictional name) is also known as Charter Communications, Inc. (corporate name). Dkt. #145 at ¶ 10.  (The caption has been changed to reflect this amendment).  Plaintiff also amended his complaint to redefine his proposed federal collective action.  Plaintiff now seeks to bring his federal claims on behalf of any current and former Charter employees who meets the following criteria:

1. Held one or more of the following positions or equivalent positions: Broadband Technician I, II, III, and V-Lead; Senior Broadband Technician; System Technician I and II; Senior System Technician; and System Technician-Lead (also known as Service Technician, Installer and Installer Repair Technician);

2. Was assigned a company vehicle by Charter; and

3. Took a company vehicle home on one occasion or another and kept that vehicle overnight at his or her home.

Id. at ¶ 13A.

3

The putative class members seek wages and overtime compensation for the following tasks: loading and unloading company equipment from company vehicles; changing the oil and performing other routine maintenance on company vehicles; performing safety and maintenance checks on company vehicles; traveling to and from their homes to their assigned field offices in company vehicles; completing work activity logs at the field office; reconciling equipment; cleaning, organizing and supplying their company vehicles; and working stand-by time before which they must load their vehicle and after which they must unload their vehicle. Dkt. #145, ¶¶ 14, 54 and 57. The putative class also seeks recovery of sales commissions that were calculated improperly by Charter. Id. In addition to plaintiff and Jesse Taylor Cone, Joseph Casmir Niderleidner, a resident of Janesville, Wisconsin, is willing to participate in this lawsuit as a named employee or party plaintiff. Dkt. #191 at ¶ 19 and Exh. B.

Charter's written company vehicle policy (last revised on November 19, 1991) states that employees who have completed their initial job training and live within five miles of the edge of the system they service *may* drive company vehicles home during non-working hours or while on call. No personal use of the vehicle is allowed at any time for any reason and no passengers are allowed to ride in the company vehicle at any time. The employee is responsible for parking and locking the vehicle in a secure area at all times, securing valuable equipment inside his or her home when the vehicle is parked at his or her home overnight,

4

locking tools in the tool box if one is provided, ensuring that the exterior and interior of the vehicle is clean at all times, notifying his or her supervisor if his or her license becomes suspended or he or she becomes uninsurable and reporting accidents to his or her supervisor immediately.  An employee who chooses to drive a company vehicle home overnight may be required to assist with system restoration efforts during major outage situations, even if that employee is not on call. The employee is responsible for lost equipment or vehicle damage that occurs on the employee's property if the employee is negligent or fails to follow proper safety and precautionary procedures.  An employee who is involved in a preventable or at-fault accident in a company vehicle will lose the privilege of driving the company vehicle home for a designated period of time.  Violations of the company vehicle policy will result in immediate termination of employment.  Employees who choose to take Charter vehicles home must sign this policy, stating that they agree to its requirements and understand the consequences of failing to comply with them.  Dkt. #209, Exh. 1.  The company vehicle policy is included in Charter's employee handbook, which includes an acknowledgment form for employees to sign.  Dkt. #191, Exh. A and #209, Exhs. #2 and #3.

Charter's written equipment and tool policy states that the employee is responsible for repair or replacement costs of tools or equipment that are damaged or lost as a result of the employee's negligence, up to a maximum of $500.  Employees are required to sign this form.  Dkt. #209, Exh. #4.  "Clean, maintain, stock and secure assigned vehicle and

equipment" are listed as essential functions in the job descriptions for Broadband Technician I, II and III and Senior Broadband Technician.  Dkt. #188.

In response to plaintiff's discovery request for production of any documents setting forth policies and practices regarding the use of a company vehicle, defendants did not produce any document indicating that employees could deviate from the above written policies except for a memorandum to operation staff dated October 1, 2007.  Dkt. #209 ¶¶ 11 and 13, Exh. #6 at 14 and Exh. #8.  That memorandum states that "[a]ll Charter equipment must be secured at all times, which could mean taking equipment into the BBT's home."  Dkt. #209, Exh. #8, Bates No. CH5067.

According to information provided by Charter during discovery, the vast majority of individuals employed in the job positions listed in the putative class definition were authorized to and did take company vehicles home overnight.  Dkt. #206.  In addition to plaintiff and Cone, the following current or former Charter employees declared that they took company vehicles home overnight:  Joseph Casmir Niderleidner (current Broadband Technician I), David Zrout (current Broadband Technician III), Nick Seichter (current Broadband Technician I) and Matthew Tuescher (current Broadband Technician II) in Janesville, Wisconsin; Mark Senne, a former Broadband Technician I and II in Fairmont, Minnesota; Shawn Turner, a former Broadband Technician I and II and System Technician in Onancock, Virginia; Christopher Shoup, a former System Technician I and Lead in

6

Monroe, Michigan; Marc Goodell, a former Broadband Technician I, II and III in Monroe, Michigan; Brian Ayers, a former Service Technician and Broadband Technician III in Lenoir, North Carolina; George Carter, a former Broadband Technician III in Lenoir, North Carolina; Josh Parham, a former Broadband Technician and System Technician in Stockbridge, Georgia and a former System Technician supervisor in the Cedartown and Carleton, Georgia offices; Wendle Lee Williams, a former Broadband Technician in Lenore, West Virginia; Guy Smith, a former Broadband Technician II in Albertville, Alabama; Matthew Kuziel, a former Broadband Technician II in Petoskey, Michigan; and Louis Boucher, a former Broadband Technician I and Systems Technician in Montgomery, Alabama.  Senne spent 10 to 15 minutes driving to his office after his last customer stop of the day before taking his vehicle home.   Niderleidner, Turner, Goodell, Carter, Ayers, Williams, Smith, Kuziel, and Boucher drove their company vehicles home from their last customer job of the day.  None of these employees have been paid for their travel time.  Dkt. ##191-202, 204-05 and 207.  However, Goodell and Senne were paid for travel time if it occurred before their shift ended at 5:00 p.m.  Dkt. #230, Exh. #9 at 63-65 and Exh. #10 at 71-72.

All of the above employees except Ayers, Tuescher and Senne spend or spent at least 10 to 15 minutes unloading equipment from their vehicles and securing it in their homes overnight and another 10 to 15 minutes loading the equipment into their vehicles in the morning.  Ayers spent only five to seven minutes loading and unloading.  Tuescher spent 15 minutes securing the equipment in his vehicle at home and Senne spent 10-15 minutes

7

unloading his equipment into the Charter office.  Until recently, none of these employees were paid for the time spent unloading or loading equipment.  Dkt. ##191-202, 204-05, 207 and 230, Exh. #7 at 69-71.  However, Ayers and Senne were paid for these activities if they were able to complete them before their shift ended at 5:00 p.m.  Dkt. #230, Exh. #7 at 54-55 and Exh. #10 at 84-85.  John Hicks, a direct supervisor of technicians in the Janesville, Wisconsin office, testified that during his tenure with Charter, it has always been Charter's policy for employees to secure equipment inside their homes when they take their company vehicles home overnight.  According to Hicks, it takes a technician approximately 15 minutes to load or unload equipment from a Charter vehicle.  He stated that employees are expected to carry out that policy and may be disciplined for violating it.  Hicks also agreed that the equipment is necessary for technicians to do their jobs.  Dkt. #190, Exh. #2 at 18, 56-57, 62-64, 104-105.  Plaintiff received a corrective action report in November 2006 for not storing company equipment in his home overnight.  Dkt. #209, Exh. #5.

All of the above employees except Shoup and Williams arrived at work 15 to 30 minutes before the start of their shift to complete paperwork, clean and organize their company vehicles or organize, reconcile, return and restock equipment.  Turner, Goodell, Parham, Carter, Ayers, Smith, Kuziel and Boucher observed others doing the same.  Turner's supervisor told him to arrive at 7:30 a.m. in order to complete paperwork and have the truck ready to go before going on the clock at 8:00 a.m.  Although none of the other employees were told to come in early or do work off the clock, their supervisors told them that they had to be ready to be out the door at the start of their shift and the supervisors were aware that

they came in early to complete required tasks off the clock.  As a supervisor, Parham knew that the system technicians he supervised and other technicians in the office arrived 20 to 30 minutes early so they could be ready to go at 8:15 a.m. when they went on the clock. Hicks observed most of the technicians he supervised doing paperwork, reconciling equipment and organizing their vehicles for up to 30 minutes before going on the clock.  He never said anything to his employees one way or the other about this practice.  After plaintiff filed this lawsuit, Hicks's supervisor told him that employees were no longer allowed to perform these tasks off the clock.  Dkt. #209, Exh. #2 at 73-77.

To motivate employees to be more effective, Charter uses a point system that requires employees to earn a specific number of points per hour.  Employee work performance is evaluated in part based on the point system.  Dkt. #190, Exh. #2 at 82-85.  Throughout plaintiff's employment with Charter, he has worked under this task-based quota system, which requires him to complete a specific number of tasks during each shift.  Zrout also works under such a system.  For each task performed, plaintiff earns a certain number of points.  If he is unable to earn the required number of points during a shift, he may be penalized under Charter's performance improvement plan.  During performance reviews, plaintiff's supervisors consider the total number of points accumulated by plaintiff and the average number of points earned by plaintiff per hour.  Dkt. #189 at ¶¶ 4-10.  Until last year, plaintiff was not compensated and did not receive points for the following tasks: loading and unloading company equipment from his work vehicle; changing the oil and performing other routine maintenance on his work vehicle; performing safety and

maintenance checks on his work vehicle; traveling to and from his home to his assigned field office in his work vehicle; completing work activity logs at the field office; reconciling equipment; and cleaning, organizing and supplying his work vehicle.  Dkt. #145 at ¶ 6 and #189 at ¶ 14.  In order to maintain a higher hourly point average, plaintiff went to work early and completed the above tasks before starting his paid workday.  After plaintiff filed this lawsuit, Charter required him to perform these tasks on the clock, and as a result, his hourly point average has decreased.  Dkt. #189 at ¶¶ 11-14.

DISCUSSION

A.  <u>Legal Standard</u>

Plaintiff seeks to bring his federal claims under 29 U.S.C. § 216(b) on behalf of all current and former Charter employees who have held one of several identified positions, were assigned a company vehicle by Charter and took that vehicle home overnight on at least one occasion.  As discussed in the court's December 19, 2007 Order, dkt. #154, the first step in certifying a collective action requires the court to determine whether potential class members are "similarly situated" and should be given notice and the opportunity to opt-in. <u>Clarke v. Convergys Customer Management Group, Inc.</u>, 370 F. Supp. 2d 601, 604 (S.D. Tex. 2005); <u>Flores v. Lifeway Foods, Inc.</u>, 289 F. Supp. 2d 1042, 1045 (N.D. Ill. 2003); <u>Kane v. Gage Merchandising Services, Inc.</u>, 138 F. Supp. 2d 212, 214 (D. Mass. 2001). This determination should not involve adjudication of the merits of the claims.  <u>Id.</u>  At this stage, plaintiff must make only "a modest factual showing" that he and potential class

10

members were "victims of a common policy or plan that violated the law." <u>Young v. Cooper</u>

<u>Cameron Corp.</u>, 229 F.R.D. 50, 54 (S.D.N.Y. 2005) (citations and quotations omitted); <u>see</u>

<u>also</u> <u>Gambo v. Lucent Technologies</u>, No. 05-C-3701, 2005 WL 3542485, at *4 (N.D. Ill.

Dec. 22, 2005); <u>Hoffman v. Sbarro, Inc.</u>, 982 F. Supp. 249, 261 (S.D.N.Y. 1997).  Put

another way, a plaintiff must demonstrate that there is some factual nexus that connects him

to other potential plaintiffs as victims of an unlawful practice.  <u>Clarke</u>, 370 F. Supp. 2d at

605; <u>Heagney v. European American Bank</u>, 122 F.R.D. 125, 127 (E.D.N.Y. 1988).  In

determining whether plaintiffs have met their initial burden, courts rely on the complaint

and any affidavits that have been submitted.  <u>Bell v. Mynt Entertainment, LLC</u>, 223 F.R.D.

680, 682 (S.D. Fla. 2004); <u>Mooney v. Aramco Services Co.</u>, 54 F.3d 1207, 1213-14 (5th

Cir. 1995).


## B.  <u>Motion to Strike Affidavits</u>

As additional evidence that he is similarly situated to the proposed class, plaintiff has

submitted declarations from 15 current and former Charter employees.  Dkt. ##188-207.

Defendants seek to strike portions of the declarations submitted by Ayers, Kuziel, Goodell,

Senne, Boucher and Smith on the grounds that they were made without personal knowledge,

are not substantiated by fact or directly contradict the declarant's deposition testimony.

Dkt. #230.

1.  Personal knowledge

As discussed previously in this case, an affiant must testify about what he observed himself and not speculate about what he thinks happened.  December 19, 2007 order, dkt. #154 at 24 (citing Payne v. Pauley, 337 F.3d 767, 772 (7th Cir. 2003); Fed. R. Evid. 602 (witness must have personal knowledge of matter in order to testify to it)).  "[A]lthough personal knowledge may include reasonable inferences, those inferences must be 'grounded in observation or other first-hand personal experience.'"  Payne, 337 F.3d at 772 (quoting Visser v. Packer Engineering Associates, Inc., 924 F.2d 655, 659 (7th Cir. 1991)).

In their declarations, Senne, Goodell, Ayers, Kuziel and Boucher stated that their supervisors were aware that they performed paperwork and readied their company vehicles before going on the clock at the start of their shifts.  Dkt. #195, ¶ 7; dkt. #197, ¶ 13; dkt. #200, ¶ 13; dkt. #205, ¶ 12; and dkt. #207, ¶ 10.  Defendants contend that these statements were based on speculation because these employees either admitted that their supervisors were not always present and they were not certain of what their supervisors knew.  However, Goodell and Senne testified at their depositions that they based their statements on the fact that their supervisors saw them at the office before 8:00 a.m. and signed off on their timesheets, which indicated that they were not "on the clock" until 8:00 a.m.  Dkt. #230, Exh. #9 at 82-83 and Exh. #10 at 63-68.  Although Ayers admitted that his supervisor was not always there when he was doing work prior to his shift, he said that this was only rarely the case.  Dkt. #230, Exh. #7 at 85-86.  Similarly, Kuziel admitted that his supervisor did not observe him when he worked out of other offices, but he explained

that this was true for only a total of three months out of his three and a half years of employment. Dkt. #230, Exh. #8 at 114-115. Defendants criticize Boucher's declaration because he testified at his deposition that his supervisor "probably" saw him out in the parking lot getting his equipment together. Dkt. #230, Exh. #12 at 73. However, Boucher also stated that his supervisor was present when Boucher was there before 8:00 a.m. and that his supervisor told him  that he would not be paid until 8:00 a.m. Id. Given these explanations, it was reasonable for these employees to infer that their supervisors were aware that they performed work before going on the clock in the morning. Therefore, I am not striking those paragraphs of the declarations.

Defendants object to the statements of Goodell, Ayers, Smith, Kuziel and Boucher that they observed co-workers performing paperwork and other tasks before going on the clock. See dkt. #197, ¶ 14; dkt. #200, ¶ 14; dkt. #204, ¶ 11; dkt. #205, ¶ 13; dkt. #207, ¶ 11. Defendants contend that the declarants admitted later in their depositions that they did not know personally whether their co-workers were actually paid for this time because they never saw their co-workers' time sheets. Although defendants are correct, the declarants merely stated in their declarations that they observed their co-workers doing certain tasks "before going on the clock" or the start of the shift. None stated that they knew whether these employees actually were paid. However, it is reasonable for the declarants to infer that the time other employees spent on tasks before going on the clock was not paid because they themselves were not paid until their shift started. See Payne, 337 F.3d at 772 (personal knowledge may include reasonable inferences grounded in observation or first-hand

13

experience).  I will not strike those paragraphs but weigh the declarants' statements accordingly.

Defendants ask the court to strike paragraphs 7 and 8 of Goodell's declaration as speculative because he admitted at his deposition that the amount of time he declared that he spent unloading, securing and loading his equipment were "guesses."  Dkt. #197, ¶¶ 7-8. However, as plaintiff notes, Goodell went on to explain in his deposition that he had provided his best estimate based on the average amount of time that it took him to perform these tasks.  Dkt. #230, Exh. #9 at 95-97.  This testimony is consistent with Goodell's declaration, in which he uses the terms "approximately" and "on average."  Dkt. #197, ¶¶ 7-8.  Because I am satisfied that Goodell made good faith estimates of the amount of time spent doing certain activities based on his first-hand experience, I am not striking the paragraphs.


2.  Inconsistencies with later deposition testimony

Defendants object to the following paragraphs on the ground that the declarants' statements are directly and materially contradicted by the declarants' later deposition testimony:

- Senne's declaration, paragraphs 5-7, 9, 11, and 13.  Dkt. #195.

- Goodell's declaration, paragraphs 6-7, 10-12.  Dkt. #197.

- Ayers's declaration, paragraphs 7-10 and 12-13.  Dkt. #200.

- Smith's declaration, paragraph 8.  Dkt. #204.

14

- Kuziel's declaration, paragraphs 4-5 and 11-12.  Dkt. #205.

- Boucher's declaration, paragraphs 7-9.  Dkt. #207.

Relying on the "sham affidavit" rule, defendants argue that the court must declare the above paragraphs incredible as a matter of law because the declarants gave inconsistent testimony in their later depositions.  Defendants want the court to rely instead on the later deposition testimony.

The Court of Appeals for the Seventh Circuit has "long followed the rule that parties cannot thwart the purposes of summary judgment by creating 'sham' issues of fact with affidavits that contradict their prior depositions."  Bank of Illinois v. Allied Signal Safety Restraint Systems, 75 F.3d 1162, 1168 (7th Cir. 1996); see also Patton v. MFS/Sun Life Financial Distributors, Inc., 480 F.3d 478, 488 (7th Cir. 2007); Pourghoraishi v. Flying J, Inc., 449 F.3d 751, 759 (7th Cir. 2006); Knauf Realty, LLC v. Prudential Real Estate Affiliates, Inc., 486 F. Supp. 2d 855, 857 (W.D. Wis. 2007).  This case involves a different scenario.  No summary judgment motion is before the court and the witnesses' deposition testimony followed their filing of sworn affidavits.  Therefore, it is questionable whether the rule is applicable in this case.  In any event, the court of appeals has admonished district courts not to disregard testimony unless the contradiction is unmistakably clear.  Patton, 480 F.3d at 488 (question is whether later testimony is "plainly incredible").  "A definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence."  Bank

15

of Illinois, 75 F.3d at 1169-70 (quoting Tippens v. Celotex Corp., 805 F.2d 949, 953 (11th Cir. 1986)).

I have reviewed each of the disputed paragraphs and compared the declarants' statements to their later deposition testimony.  Although there are some inconsistencies between the declarations and the depositions, they do not establish that the declarations are shams or plainly incredible.  In most instances, the declarant was clarifying an earlier statement, responding to a litany of questions about possible exceptions to his factual allegation or admitting that he may have spent less time driving, securing equipment or performing other work off the clock than estimated in his declaration.  For example, Senne and Goodell stated in their declarations that they were not paid for time spent travelling between home and work.  Defendants challenge their statements because both men testified in their depositions that they did get paid for travel if they completed it before their shift ended at 5:00 p.m.

The noted discrepancies are equivocal and not material at this stage of the litigation. Bank of Illinois, 75 F.3d at 1169 n.10 (the sham "rule applies only to cases in which the statements are inherently inconsistent and in which the contradiction is not the result of an honest discrepancy").  Although the discrepancies may be relevant in determining the credibility of the witness or weighing the evidence, they do not mandate striking the objectionable paragraphs.  Turner v. Miller, 301 F.3d 599, 604 (7th Cir. 2002) (witness credibility determined by trier of fact); Bank of Illinois, 75 F.3d at 1170 (quoting Tippens

16

v. Celotex Corp., 805 F.2d at 953) (trier of fact determines at which time and with which words the affiant was stating the truth).

I do agree with defendants' objections to paragraphs 7 and 8 of Ayers's declaration. In those paragraphs, Ayers stated that on average it took him 15 to 20 minutes to secure his equipment and 10 minutes to load it back into his vehicle each day.  However, Ayers later testified in his deposition that these estimates were recorded incorrectly and should be five to seven minutes for loading and unloading equipment.  Therefore, I will strike those statements and rely on his deposition testimony.


## C.  Similarly Situated

Plaintiff contends that he and other putative class members who take company vehicles home at the end of their shift are required by Charter's national policy to secure company equipment inside their homes but are not paid for either their travel time or the time spent loading and unloading the equipment.  Defendants argue that plaintiff has failed to show that he and the putative class members are similarly affected by a nationwide, unlawful practice.  Specifically, defendants assert that under the Portal-to-Portal Act, it is lawful for them not to pay employees for travel time between work and home in a company vehicle.  29 U.S.C. § 254(a).  Defendants point out that the only reason that employees would have to load and unload equipment from their home to and from the company vehicle is if they choose to take their vehicle home at night.  Defendants argue that these activities are incidental to the employee's commute and therefore are not compensable pursuant to

the Employee Commuting Flexibility Act of 1996.  Id.  Plaintiff argues that because the loading and unloading of equipment are principal work activities that begin and end a continuous workday, putative class members are entitled to be paid for travel time to and from home to work.  See 29 C.F.R. § 790.6(a) and (b) (Portal-to-Portal Act does not affect computation of hours worked within the workday, or the period from "whistle to whistle"); 29 C.F.R. § 785.38 (time spent by employee in travel as part of his principal activity counted as hours worked).

Plaintiff's claims may be precluded as a matter of law, as defendants' argue.  However, this question is not before the court.  At this stage, plaintiff need demonstrate only that there is some factual nexus that connects him to other potential plaintiffs as victims of an unlawful practice.  For now, the information is insufficient to determine whether not paying for travel time and unloading and loading of equipment is a lawful practice.  Although it is unlikely, given the right circumstances, the loading and unloading of equipment could be a principal activity not incidental to commuting.  If this were the case, then travel to and from home could be compensable.  As the lawsuit progresses, the contours of this issue will become more definite and more amenable to determination.

The allegations stated in the complaint and supporting affidavits demonstrate a reasonable basis for plaintiff's belief that he is similarly situated to potential class members regarding nonpayment for travel time to and from home and the loading and unloading of equipment.  Documents produced by defendants and the affidavits of potential class members show that the vast majority of Charter technicians drive their assigned vehicles to

18

and from work and home.  In their national company vehicle policy, national equipment and

tool policy, nationwide employee handbook and job descriptions, which appear substantially

similar for each field position across the country, defendants require employees who take

their Charter vehicles home to secure equipment in their homes.  Charter's employee

handbook also states that as a general rule the company does not compensate employees for

travelling to and from home to job sites.  No similar written policy governs compensation

for unloading and loading equipment, but all of the declarants allege that defendants did not

compensate them for these activities when they were performed outside of their regular

shifts.  Therefore, the allegations are sufficient to suggest a factual nexus between plaintiff's

situation and the situation of the potential class members.  Garza v. Chicago Transit

Authority, No. 00 C 0438, 2001 WL 503036, at *3 (N.D. Ill. May 8, 2001).  Because

plaintiff has met this initial burden, I will grant his motion and conditionally certify the class

proposed in the second amended complaint.

      As a separate claim, plaintiff asserts that he and other putative class members arrive

at work early to perform tasks off the clock before the start of their shifts and that

management knew of this practice.  Defendants argue that the supplemental evidence

submitted by plaintiff shows no common policy or supervisory instruction requiring

employees to perform tasks off-the-clock.  I disagree.  The job descriptions for Broadband

Technician and the other field service positions identified in the complaint list "clean,

maintain, stock and secure assigned vehicle and equipment" as essential functions of the job.

Although no one explicitly told the declarants to complete various work-related tasks off the

clock, most were told or at least were led to believe they had to be ready to go at the start of their shift.  It is reasonable to conclude that potential class members came in early to complete administrative and cleaning work off the clock because they knew that they had to complete a certain amount of work on the clock under the point (or quota) system if they wanted a good performance review.  Finally, almost all of the declarants and a Charter supervisor stated that management was aware that this was happening.  All but two of the declarants stated that they did paperwork, cleaned their vehicles and restocked and reconciled equipment for 15 to 20 minutes before they started their shift.  As defendants note, the declarants' deposition testimony shows the possibility of some variations in the specific amount of time that class members spent on these tasks or whether each class member performed this work off the clock every day.  However, I am satisfied at this early stage that the putative class members are similarly situated with respect to the type of tasks performed, the amount of time spent performing these tasks and management's knowledge that they were done off the clock.

Finally, plaintiff seeks recovery for himself and putative class members for sales commissions and stand-by pay that were improperly calculated as well as wages for vehicle maintenance performed outside of the workday.  Defendants assert that the supplemental evidence does not address these claims.  I agree.  Apart from general statements by plaintiff, Cone, and Niderleidner, plaintiff has alleged very little with respect to those claims.  Plaintiff asserts that defendants failed to respond to discovery requests to produce information relating to the calculation of sales commissions and compensation for stand-by time.

Although plaintiff could have done more to demonstrate a reasonable basis for why he believes that he is similarly situated to potential class members with respect to vehicle maintenance, stand-by time or sales commissions, his failure does not preclude conditional certification.  Eliminating these claims would not change the composition of the class, which includes Charter technicians who were assigned a company vehicle that they took home overnight on one occasion or another.  Further, the court has not been asked to dismiss these claims.   Instead, defendants' arguments relate to whether potential class members are similarly situated with respect to sales commissions, stand-by pay or overtime compensation for vehicle maintenance.  Because this question does not affect the composition of the class as defined in the second amended complaint, I will address this issue after the conclusion of the class opt-in period, when defendants may choose to move for decertification of the class or individual class members.

ORDER

IT IS ORDERED that plaintiff's motion for conditional certification is GRANTED.

Plaintiff is authorized to send notice to the individuals that fall within the class.  The

content and method of the notice will be addressed in a separate order.

Entered this 4th day of March, 2008.

BY THE COURT:

/s/

BARBARA B. CRABB
District Judge